**HONORABLE TIFFANY M. CARTWRIGHT**

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

MITCHELL STEPHENS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BUTCHER BOX OPCO, LLC.,

Defendant.

Case No.: 3:26-cv-05482-TMC

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CONSUMER PROTECTION ACT, RCW 19.86, AND THE COMMERCIAL ELECTRONIC MAIL ACT, RCW 19.190**

**JURY TRIAL DEMANDED**

Plaintiff Mitchell Stephens (collectively, "Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Butcher Box OpCo, LLC ("Defendant" or "Butcher Box"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this putative class action lawsuit against Defendant on behalf of himself and all others similarly situated who have received repeated marketing e-mails from Defendant containing deceptive subject lines, in violation of Washington law.

2. Defendant offers a membership program for, *inter alia*, it ships its subscribers regular meat and seafood deliveries.

3. Defendant sends, and consumers across Washington receive, each day, thousands of commercial e-mail advertisements. Many, if not most, of Defendant's e-mail advertisements contain deceptive content with deceptive "Subject" lines, promoting "[f]ree steak," "[f]ree wings for life," and sales that supposedly expire soon—but seem to never go away. These sales are hardly urgent and Defendant's "free" offers are only free with a paid subscription—or not free.

4. By sending these commercial e-mails that purport to contain "free" offers—provided the recipient *first pay* for a subscription or product—Defendant violates Washington's prohibition on sending commercial e-mail messages that "contain[] false or misleading information in the subject line." RCW § 19.190.020(1)(b).

5. For the foregoing reasons, Plaintiff brings this action individually and on behalf of all similarly situated individuals in Washington state, for violations of Washington's Commercial Electronic Mail Act, RCW 19.190, *et seq*., and Washington's Consumer Protection Act, RCW § 19.86, *et seq*.

## THE PARTIES

6. Plaintiff Mitchell Stephens is a citizen of Washington, residing in Fox Island, Washington. Defendant has sent numerous marketing e-mails with deceptive subject lines offering "free" items and urgent sales to Plaintiff's email address at his home in Washington, when in

reality, Defendant requires that consumers pay a fee to sign up for a paid Butcher Box subscription to redeem the purportedly “free” offer or otherwise participate in a purportedly time-limited sale that was billed as expiring soon when in reality it did not. Plaintiff, like Class Members, received the e-mails in Washington state.

7. Defendant is a Massachusetts limited liability company with its principal place of business at 1 Kingsbury Avenue, Watertown, Massachusetts. Upon information and belief, at all times relevant to this action, Defendant has disseminated its marketing e-mails to consumers in Washington.

## JURISDICTION AND VENUE

8. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from Defendant.

9. This Court may exercise personal jurisdiction over the out-of-state Defendant because the claims alleged in this civil action arose from, without limitation, Defendant’s purposeful transmission of e-mail messages intended to solicit business to consumers within the State of Washington, thereby transacting business within this state. As discussed more thoroughly below, Defendant knew and is chargeable with the knowledge, that its e-mails sent to Plaintiff were sent to him in Washington state. Moreover, Defendant sells various ButcherBox branded meat products at target stores in Washington state.

10. Venue is proper in this District because Defendant transactions business in this District by sending the marketing e-mails with deceptive subject lines to residents of Pierce County, including Plaintiff.

## FACTUAL ALLEGATIONS

### I. DEFENDANT INITIATES THE TRANSMISSION OF COMMERCIAL E-MAILS WITH MISLEADING SUBJECT LINES

#### A. Defendant’s Marketing Practices

11. Defendant Butcher Box offers a meal kit delivery service specializing in poultry, beef, and seafood deliveries.

12. The kits are shipped to consumers' homes in delivery boxes at intervals based on their subscription. After their first delivery, consumers are allowed to customize their delivery boxes with over 80 different meat and seafood combinations.

13. Defendant is a major player in the highly competitive meal delivery services market. Companies like HelloFresh and Blue Apron have long dominated the meal kit delivery industry leading to "intensifying competition and persistent reliance on steep introductory discounts"[1] to compete. Defendant is one such company trying to compete by sending attention-grabbing marketing e-mails with subject lines offering free perks and soon-to-close sales.

14. The e-mails constitute commercial messages. Each e-mail contains a subject line urging Plaintiff and similarly situated consumers to enroll in a paid subscription to receive the "free" offer or to sign up for a discount that will soon go away.

**B. Defendant's E-Mail Subject Lines Misleadingly Promote "Free" Offers and Time-Limited Discounts**

15. Defendant sends, from its principal place of business and corporate headquarters in Massachusetts, to Plaintiff and Class Members in Washington state, numerous advertisement e-mails containing subject lines that are written to grab the recipient's attention through offers of "free" food. Defendant sends these commercial e-mails to consumers throughout Washington state.

16. The subject lines of Defendant's "free gift" e-mails do not state or hint at the existence of any conditions or prerequisites that must be satisfied or actions that must be taken before the recipient is able to claim these benefits. In fact, based on the broad and unequivocal language of the subject lines, reasonable consumers would—and Plaintiff here did—believe that no such conditions or prerequisites exist. This is not the case. Taking advantage of the "free" officer is contingent on *buying* a recurring subscription.

17. For example, on February 12, 2026, Defendant sent Plaintiff an e-mail with the subject line "We had you at FREE steak."

[1] Jacob Posada, *Meal Kit Delivery Services in the US Industry Data and Analysis,* https://www.ibisworld.com/united-states/industry/meal-kit-delivery-services/6152/.




18. Defendant sent a similar e-mail to other class members on March 3, 2026 with the subject line "We had you at FREE steak."




19. But in the fine print of both e-mails, in miniscule font, Defendant clarifies that the "[v]alue based on non-member subscribing and ordering a subscription box every 2 weeks."




This critical caveat is only visible if the user scrolls to the very bottom of the e-mail. The cheapest subscription option Defendant offers is $179.00 for deliveries every two weeks. A subscriber's "recurring bill date depends on the frequency [they] choose, recurring either every 2, 4, 6, or 8 weeks form [their] bill date."[2] In other words, to take advantage of this supposedly "free" steak, Plaintiff

[2] Butcher Box, *When Will I Be Billed Each Month?* https://support.butcherbox.com/hc/en-us/articles/231510428-When-will-I-be-billed-each-month#:~:text=Follow,BOX%20SETTINGS%20in%20your%20account.

would need to sign up for the two week deliveries and pay $358 per month (one delivery every two weeks).

20. This e-mail is representative of Defendant's marketing practices. For example, on February 10 and February 22, 2026, Defendant sent class members a commercial marketing e-mail with the subject line: "Wait—You left FREE protein behind."




21. Similarly, on Valentine's Day, Defendant again sent class members an e-mail bearing the subject line offering "[f]ree steak & $60[.]"




22. Not to be outdone, Defendant sent nearly the same e-mail to Plaintiff on February 15, 2026, upping the ante with the subject line, "Free steak & $100 > flowers[.]"




23. Unmentioned in the same subject lines is the fact that each such offer is contingent upon the consumer signing up for a paid subscription or otherwise purchasing a product from Defendant. Yet, the Merriam-Webster dictionary defines the adjective "free" as "not costing or charging anything."[3] Thus, consumers reading these unqualified subject lines would reasonably believe that they would be able to redeem the purportedly "free" steak/protein without paying any money whatsoever. *See Tan v. Quick Box, LLC*, 2024 WL 150611, at *10–11 (S.D. Cal. Jan. 12, 2024) ("The Court has already found that Plaintiff has shown by a preponderance of the evidence that class members were exposed to the same general misrepresentations and omissions that promised a free product but instead charged them for the product and signed them up for a monthly subscription without their knowledge or permission[.]") (emphasis added). However, in reality Defendant offers "free" steak provided the consumer pays money. As such, Defendant's "free" offers are not really "free" at all.

[3] *Free*, MERRIAM–WEBSTER, *available at* https://www.merriam-webster.com/dictionary/free.

24. To add insult to injury, Defendant seeks to inject some urgency into its offers by sending a barrage of e-mails warning that a sale was ending—without ending it as threatened.

25. On February 1, 2026 at 6:07 AM, Defendant sent an e-mail to Plaintiff titled "You're going to regret not opening this." The body of the e-mail promised "a year of free" "premium steaks when [he] join[s]." But that "deal ends at midnight."




26. That February deal never ended. On February 17, 2026, Defendant sent Plaintiff an e-mail with the subject line "Okay, okay, one more day!"



27. Defendant would continue to offer free steaks in the subject lines of e-mails. As shown above, Defendant offered Plaintiff free steak on February 12 and "Free steak & $100 > flowers" on February 15, 2026.

28. These are not the first series of attempts by Defendant to falsely inject a sense of urgency into its advertisements to get consumers, like Plaintiff, to purchase quickly.

29. On March 22, 2026, Defendant warned, in an e-mail sent to Plaintiff, that "Free Ribeyes Expires Tonight." But, in fact, the offer did not expire that night.




30. Then, on March 24, 2026, Defendant e-mailed Plaintiff that *this* was his "[l]ast chance for FREE Ribeyes!" with an emoji of a character running to symbolize the urgency.




31. Remarkably, the body of the e-mail noted that this was his "ABSOLUTE LAST CHANCE" directly on the top of the body. It warned Plaintiff to "CLAIM NOW OR REGRET LATER."




32. Of course, it was not the last chance.

33. On April 27, 2026, Defendant e-mailed Plaintiff, this time with an alarm clock emoji in the subject line, that this was his "Last call for free steaks:"

Subject: ⏰ Last call for free steaks

34. But, as Defendant's April 29, 2026 e-mail to Plaintiff exclaimed in the subject line: "Plot twist: $80 OFF + FREE SIRLOINS are BACK."

Subject: Plot twist: $80 OFF + FREE SIRLOINS are BACK

35. Defendant's marketing and advertising is consistent. It seeks to capitalize on a false sense of urgency by dangling an expiration date for a sale offer that seems to never really end. Meanwhile, Defendant baits consumers with false and misleading offers of "free" gifts.

## II. DEFENDANT KNOWS OR HAS REASON TO KNOW THAT IT DIRECTS ITS MARKETING E-MAILS TO ELECTRONIC MAIL ADDRESSES THAT ARE HELD BY WASHINGTON RESIDENTS

36. CEMA prohibits sending e-mails with false or misleading subject lines where the sender knows or has reason to know that the recipient computer is owned by a Washington resident.

37. Defendant deploys various tracking technologies on the landing page where its e-mails take recipients. Once there the trackers collect information—which Defendant collects and uses for marketing purposes—thus allowing Defendant to know that Plaintiff lives in Washington state.

38. A dynamic analysis of the landing page that the e-mail Plaintiff received titled "We had you at FREE Steak" shows that Defendant employs third party trackers which collects a user's IP address. [4]

39. Specifically, Defendant employs "Podscribe," a "[a] one-stop solution to help advertisers, agencies, and publishers measure, improve, and scale performance at every stage in the

[4] A pop-up on the page invites a consumer to "Reject Cookies," which should cause any "non-essential" trackers to be switched off. However, the dynamic analysis found that—even after selecting to reject non-essential cookies with Defendant's cookie banner, third party cookies still collected a consumer's personally identifiable information at check out, which includes their name, addresses, hashed phone number, and hashed and plain-text e-mail addresses.

funnel,”[5] that has been operating since 2016. Podscribe collects user’s IP addresses when the user clicks through Defendant’s marketing e-mail and lands on Defendant’s page. Collecting IP addresses is one of “Podscribe’s Core Measurement Features,” in which it “use[s] IP matching and Tapad’s graph to track Household Reach and Frequency with 40%+ cross-device match rate.”[6] Indeed, Podscribe draws from massive amounts of data to be able to match a user’s IP address: “The new integration matches IP addresses from podcast downloads to TransUnion’s household profiles, revealing whether homeowners, college graduates, high-income households, or hundreds of other audience segments are responding to specific podcast campaigns.”[7]

40. Podscribe then stores—for Defendant’s benefit and to track Defendant’s advertising success—the IP address until it can be matched via a conversion. In other words, Podscribe “works by matching the IPs of site visitors with those of ad listeners.”[8] When the Podscribe pixel is installed, like here, “each event is sent individually from [Defendant’s] server to [Podscribe’s] server. This approach ensures that every event is processed in real-time or near real-time[.]”[9]

41. Thus, the IP address is necessarily collected by Defendant in the first instance. The IP address is then stored through its relationship with Podscribe. This is 50% of the “conversation” data that Podscribe supplies to Defendant.[10]

42. IP addresses are critical tools in helping to geolocate a device. An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets

---

[5] Podscribe, *Independent Measurement Built for Podcast & Audio Advertising*, https://podscribe.com/.

[6] Podscribe, *Incrementality Testing for Podcast Ads*, https://podscribe.com/solutions/incrementality/incrementality-testing.

[7] David Adler, *How Podscribe’s TransUnion Integration Brings Demographic Precision to Podcast Advertising*, NET INFLUENCER, https://www.netinfluencer.com/how-podscribe-transunion-integration-brings-demographic-precision-to-podcast-advertising/.

[8] Podscribe, *Help Center*, https://help.podscribe.com/sending-podscribe-conversion-events-/g4g8w3hppouCfkXZdcx6FV/sending-events-server-to-server-s2s-in-batch-or-as-an-img-tag/67UdckfSLHXAPtUAfWDyud.

[9] *Id.*

[10] Podscribe, *How Podscribe Attribution Works*, available https://help.podscribe.com/measurement-/2ZBnvGeWNLNMWii3CPyVig/how-podscribe-attribution-works/jDrakBzTX9TGc6WxVVFJYU (“We do this on a household level, by matching the IP address the impression occurred on to the IP address the view or purchase was made on.”).

of numbers separated by periods (*e.g.*, 192.168.123.132). Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally. Public IP addresses are required for devices that need direct internet access.

43. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services. This includes Defendant who places the Podscribe pixel on its landing page to assist in its marketing efforts.

44. Indeed, Podscribe offers geolocation podcast marketing to its clients. In 2025, Podscribe teamed up with audience tracking giant Nielsen to "license Nielsen's proprietary [] data and integrate it into its reporting capabilities. By leveraging Nielsen's … information, which spans 210 media markets across the country, Podscribe will empower its users with the most clear-cut geographical audience data relevant to both buyers and sellers in the digital audio space."[11] With this partnership, Podscribe users—like Defendant—can "[a]ccess localized ad targeting and reporting by media market[,]" "[s]upport internal and third-party data segmentation by geographic market[,]" and "[s]tandardize location-based audience mapping."[12]

45. Podscribe is not shy about its accuracy. "How accurate is Podscribe's IP-based attribution? Very accurate. Podscribe uses first-party data, household-level IP matching, and a dual-device graph … to achieve match rates of 85% or higher across channels."[13] And Podscribe's

---

[11] NIELSEN, *Podscribe to Leverage Nielsen DMA Data to Enhance Audience Reporting Capabilities*, https://www.nielsen.com/news-center/2025/podscribe-to-leverage-nielsen-dma-data-to-enhance-audience-reporting-capabilities/.

[12] *Id.*

[13] Podscribe, *Podscribe Solutions*, available https://podscribe.com/solutions.

data collection and matching efforts are not limited to just podcasts. "Podscribe supports attribution across multiple audio platforms, including YouTube and streaming audio. It tracks podcast ads and integrates with [the client's] broader marketing efforts, offering cross-channel visibility into ad performance, helping advertisers make better-informed decisions across different audio platforms."[14] And Podscribe "can report on … the geography of the listeners, eg by country/city/[Nielsen service]/zip."[15] And because Defendant has configured the Podscribe pixel on the landing page connected to the receipt of the e-mails at issue, it is clear that Defendant intends to collect the data from Plaintiff and Washington state consumers for its own marketing purposes.

46. This shows that Defendant has access to—if it has not done so already—Plaintiff's geolocation data. This includes the IP addressing information of Plaintiff which Defendant would have captured when he—according to Defendant—visited the landing page in 2019 and 2026 where Plaintiff would have purportedly seen a "LIMITED TIME ONLY" offer. Defendant sent subsequent e-mails with false and misleading subject lines. The dates, operative settings, and for how long these trackers were deployed on Defendant's marketing e-mails and website landing pages those e-mails take recipients, will be determined in discovery.

## III. CEMA AND WCPA PROHIBIT SENDING COMMERCIAL E-MAILS WITH MISLEADING SUBJECT LINES

47. Washington's Commercial Electronic Mail Act (CEMA) regulates deceptive email marketing.

48. "CEMA was enacted to protect concrete interests in being free from deceptive commercial e-mails. CEMA's prohibition on sending commercial e-mails with false or misleading subject lines … creates a substantive right to be free from deceptive commercial emails." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1011 (W.D. Wash. 2019 Nov. 27, 2019) (holding that the plaintiff sufficiently pleaded concrete injury-in-fact for alleged CEMA violations based on her

---

[14] *Id.*

[15] Podscribe, *Setting Up Publisher Tracking Overview – For Advertisers*, available https://help.podscribe.com/campaign--publisher-tracking-setup/mdPMabRsDPjesRTbktukZc/setting-up-publisher-tracking-overview-%E2%80%94-for-advertisers/d5Co5FqN6pU6XQFerZUQL4.

receipt of marketing emails from the defendant containing allegedly false "xx% off" statements in the subject line). Washington courts have held that "[t]he harms resulting from deceptive commercial e-mails resemble the type of harms remedied by nuisance or fraud actions." *Id.* at 1008.

49. An injury occurs anytime a commercial e-mail is transmitted that contains false or misleading information in the subject line. *Id.* at 1011. Under CEMA, it is irrelevant whether misleading commercial e-mails were solicited. *Id.*

50. CEMA creates an independent but limited private of right of action which can be asserted by a person who is the recipient of a commercial electronic mail message which contains false or misleading information in the subject line. *See* RCW 19.190.030(1)(b). A plaintiff who successfully alleges and proves such a violation may obtain, among other things, an injunction against the person who initiated the transmission. RCW 19.190.090(1). *Wright v. Lyft, Inc*., 189 Wn.2d 718, 728 n. 3 (2017) ("we note that a plaintiff may bring an action to enjoin any CEMA violation.").

51. It is a violation of the consumer protection act, RCW 19.86 *et seq*., to initiate the transmission or conspire with another person to initiate the transmission of a commercial electronic mail message that contains false or misleading information in the subject line. RCW 19.190.030(1)(b). *See also* RCW 19.190.030(3) (providing "that the practices covered by this chapter are matters vitally affecting the public interest for the purpose of applying the consumer protection act, chapter 19.86 RCW. A violation of this chapter is not reasonable in relation to the development and preservation of business and is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer protection act, chapter 19.86 RCW.").

52. To establish a violation of Washington's CPA, a claimant must establish five elements: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business or property, and (5) causation. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).

53. Washington and federal courts have held that a plaintiff states a CPA claim solely by alleging a violation of the CEMA. *See State v. Heckel*, 143 Wash.2d 824, 24 P.3d 404, 407 (2001) ("RCW 19.190.030 makes a violation of [CEMA] a per se violation of the [CPA].").

54. Indeed, by alleging a CEMA violation of RCW 19.190.020, a plaintiff alleges all five elements of a CPA violation. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1065 (9th Cir. 2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 719 P.2d 531, 535-37 (1986)); *Wright,* 406 P.3d at 1155 ("We conclude that RCW 19.190.040 establishes the injury and causation elements of a CPA claim as a matter of law.").

## CLASS ALLEGATIONS

55. **Class Definition.** Plaintiff brings this action pursuant to Washington Superior Court Civil Rule 23 on behalf of a Class of similarly situated individuals, defined as follows:

> All persons residing in Washington State who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, received one or more commercial e-mails from Defendant stating or implying an offer of a "free" gift, product, or service, that was only recoverable upon the recipient purchasing a subscription and/or product from Defendant and/or received an offer of a limited time discount that continued to be extended from Defendant.

56. Excluded from the Class is: (1) Defendant and its current or former officers, directors, employees, and principals, as well as affiliated entities, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent have a controlling interest, (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

57. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

58. **Numerosity.** Members of the Class are so numerous that joinder of all members is impracticable. On information and belief, the Class is comprised of thousands of people who received commercial e-mails from Defendant throughout Washington that contained the misleading subject lines. The precise number of Class members and their identities are unknown to Plaintiff at

this time but may be determined through discovery, including through records maintained by Defendant and its agents. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

59. **Commonality and Predominance.** There is a well-defined community of interest and common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Specifically, common legal and factual questions include, but are not limited to:

a. whether Defendant's "free" offer claim is false and misleading;

b. whether Defendant's e-mails are commercial e-mails as defined by the statute;

c. whether Defendant's conduct violated the statutes referenced herein;

d. whether Defendant was aware that it was sending commercial e-mails to recipients in Washington state;

e. whether Plaintiff and Class Members are entitled to damages and injunctive relief and in what amount.

60. **Typicality.** The claims of the named Plaintiff are typical of the claims of the Class Members in that Plaintiff and Class Members received commercial e-mails that were sent from Defendant containing false and misleading subject lines.

61. **Adequacy.** Plaintiff will fairly and adequately protect Class Members' interests. Plaintiff has no interests antagonistic to Class Members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class actions and consumer protection cases.

62. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner. Indeed, even if every Member of the Class could afford to pursue individual litigation, the Court system could not. It would be

unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and the court system, resulting in multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system and protects the right of each Member of the Class. Plaintiff anticipates no difficulties in the management of this action as a class action. Class-wide relief is essential to compel compliance with Washington law.

## CAUSES OF ACTION

### COUNT I

**Violation of Washington's Commercial Electronic Mail Act ("CEMA")**
**RCW 19.190, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

63. Plaintiff hereby incorporates by reference each and every allegation as if fully set forth herein.

64. Washington's CEMA prohibits any "person," as that term is defined in RCW 19.190.010(11), from initiating or conspiring to initiate the transmission of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that contains false or misleading information in the subject line.

65. Defendant Butcher Box is a "person" within the meaning of RCW 19.190.010(11).

66. Defendant knows, or has reason to know, that Plaintiff is a Washington resident.

67. Defendant initiated the transmission or conspired to initiate the transmission of one or more commercial electronic mail messages to Plaintiff and Class Members with false or misleading information in the subject line.

68. Defendant's acts violate RCW 19.190.030(1)(b).

69. Defendant's acts injured Plaintiff and proposed Class members.

70. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, the members of the Class and the general public will be irreparably harmed

absent the entry of permanent injunctive relief against Defendant. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is, based on information and belief, ongoing as of the date of the filing of this pleading; absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, is likely to recur.

71. Plaintiff and Class members are therefore entitled to injunctive relief in the form of an order enjoining further violations of RCW 19.190.030(1)(b) and statutory damages of $500 per violation pursuant to RCW 19.190.040.

**COUNT II**
**Violation of Washington's Consumer Protection Act ("CPA")**
**RCW § 19.86, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

72. Plaintiff hereby incorporates by reference each and every allegation as if fully set forth herein.

73. Plaintiff and Class members are "persons" within the meaning of the CPA, RCW 19.86.010(1).

74. Defendant violated the CEMA by initiating or conspiring to initiate the transmission of a commercial electronic mail messages to Plaintiff and Class Members' that contain false or misleading information in the subject line.

75. A violation of CEMA is a "per se" violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86.010, *et seq*. *See* RCW 19.190.030(1).

76. A violation of the CEMA establishes all five elements of Washington's Consumer Protection Act as a matter of law.

77. Defendant's violations of the CEMA are unfair or deceptive acts or practices that occur in trade or commerce under the CPA. RCW 19.190.100.

78. Defendant's unfair or deceptive acts or practices vitally affect the public interest and thus impacts the public interest for purposes of applying the CPA. RCW 19.190.100.

79. Pursuant to RCW 19.190.040(1), damages to each recipient of a commercial electronic mail message sent in violation of the CEMA are the greater of $500 for each such

message or actual damages, which establishes the injury and causation elements of a CPA claim as a matter of law. *Lyft, Inc.*, 406 P.3d at 1155.

80. Defendant engaged in a pattern and practice of violating the CEMA. As a result of Defendant's acts and omissions, Plaintiff and Class Members have sustained damages, including $500 in statutory damages, for each and every email that violates the CEMA. The full amount of damages which will be proven at trial. Plaintiff and Class Members are also entitled to recover their reasonable attorneys' fees and costs, pursuant to RCW 19.86.090.

81. Under the CPA, Plaintiff and Members of the Class are also entitled to, and do seek, injunctive relief prohibiting Defendant from violating the CPA in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, seeks relief as follows:

(a) For an order certifying the Class under Fed. R. Civ. P. 23, naming Plaintiff as representative of the Class, and appointing Plaintiff's attorneys as Class Counsel to represent the proposed Class;

(b) For an order declaring Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 27, 2026

Respectfully submitted,

**CARSON NOEL PLLC**

By: */s/ Wright A. Noel*

Wright A. Noel (State Bar No. 25264)
20 Sixth Avenue NE
Issaquah, WA 98027
Telephone: (425) 837-4717
Facsimile: (425) 837-5396
Email: wright@carsonnoel.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice*)
Julia K. Venditti (*pro hac vice*)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com
jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joshua B. Glatt *(pro hac vice)*
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Class*